## 2125. UNION v. THE STATE.

1. The evidence authorized the verdict.
2. No matter what the number of witnesses introduced for the purpose, nor the method employed in attempting to impeach a witness, the credibility of a witness whose impeachment is sought is, after all, a matter for the exclusive determination of the jury.
3. The fact that a witness in a criminal case is to be paid a reward in the event of the conviction of the defendant may affect the credibility of his testimony, but does not render the witness incompetent to testify. The pecuniary interest of a paid detective may discredit him, but does not incapacitate him as a witness.
4. Articles taken from the dwelling of one accused of crime, which may tend to connect him with its commission, may properly be submitted to the jury trying the case, as explanatory of their possession and use by the defendant, as well as for the purpose of enabling the jury to determine by physical examination whether the identification of the articles is satisfactory.

Accusation of sale of liquor; from city court of Brunswick—Judge Krauss. August 27, 1909.

Submitted October 6,—Decided November 9, 1909.

*Francis H. Harris,* for plaintiff in error.

*Ernest Dart, solicitor,* contra.

RUSSELL, J. The defendant was convicted of a violation of the prohibition law. One witness testified positively to a sale of whisky; that he was familiar with the effects of whisky, and that the liquid he bought was intoxicating. Another witness testified, that he was informed that the defendant was engaged in selling intoxicating liquors, and that he went to the defendant's house, on a rice plantation about nine miles from Brunswick, and stationed himself where he could see inside, through a hole about as large as his fist, and saw quite a number of persons served by the defendant from a jug; that the liquid was first poured into a tomato can for the customer, who thereafter drank it from a broken wine glass; that after satisfying himself as to the nature of the transaction being conducted in the defendant's house, he entered the house in company with another, arrested the defendant, and seized the jug,

the tomato can, and the broken glass. This latter witness testified that he had never drunk a drop of whisky in his life, but that the liquid in the jug smelled like whisky, and that it was whisky; that he saw at least a half-dozen men buy and pay for the liquid that came out of the jug; the money was paid to the defendant, and the witness saw change made, and saw the men drink out of the glass after the liquid was poured from the tomato can. The jug, the can, and the glass were delivered to Mr. Lowe, the jailor, and their possession accounted for from the time they were delivered to him by the witness, up to the time they were offered in evidence. Several witnesses testified that the general character of the witness who testified that he himself had·purchased whisky from the defendant was so bad that they would not believe him on oath. The testimony of Higginbotham, who testified to the transaction identified by the jug, the tomato can, and the broken glass, was objected to upon the ground that the witness admitted that he would receive, in the event of the conviction of the defendant, a reward of $25, which had been offered by the county commissioners of Glynn county.

1. The evidence authorized the conviction of the defendant. The testimony of the witness Powell was direct and unequivocal, to the effect that he bought from the defendant, at a time within the statute of limitations, a half pint of whisky, and paid him thirty-five cents for it; that he bought the whisky and drank it, and that it was intoxicating.

2. An effort was made to impeach the testimony of Powell by proof of bad character. Most of the witnesses introduced for this purpose testified merely to the effect that his character was bad, for fighting and shooting; and of course, upon this, the jury would have been authorized to find that although the witness was turbulent, he need not for that reason be untruthful. But, though there was testimony which fully met the requirements of testimony designed to impeach a witness by proof of general bad character, the jury were not bound, for this reason, to discredit the testimony of the witness whose impeachment was attempted. .In the first place, the jury saw the attacking witnesses, as well as the witness attacked, and may have been convinced, from their appearance upon the stand, that the witness attacked was more trustworthy than those by whom it was sought to impeach him. Or if not (and this is

more in accord with the reason of the law), although they may have believed that the witnesses who swore to the bad character of the State's witness testified honestly when they said that they would not believe him, the jury may have been satisfied that in the particular case then on trial the witness was swearing the truth, notwithstanding he bore a bad character. So fully is the subject of impeachment within the province of the jury that if they (in spite of an attempt at impeachment) find a verdict which can be sustained only on the theory that the testimony of the witness sought to be discredited was accepted as true, a reviewing court is powerless to disturb the finding, unless some error of the trial judge contributed to the result.

3. When the witness Higginbotham was introduced, the defendant asked that the jury be retired, and strenuously maintained that the witness was incompetent to testify, by reason of the fact that he was interested in the result, and would receive a reward of $25 in case of the conviction of the defendant. The court overruled the objection, and Higginbotham was permitted to testify, as has already been stated, as to having seen several persons purchase and pay for a liquid poured from a jug into a tomato can at the defendant's house. The witness admitted that a reward of $25 had been offered by the county commissioners of Glynn county, to be paid to the informant, in each case where a conviction of violating the prohibition law was secured, and that he expected to receive that reward if the defendant was found guilty. There is no merit in the contention of learned counsel of plaintiff in error that Higginbotham, because he was an informer and because he would receive a reward of $25 in event of the defendant's conviction, was incompetent to testify. The interest of a witness may affect his credibility, but it does not touch the competency of his testimony, except as expressly provided in the six exceptions to the general rule laid down in § 5269 of the Civil Code. Interest may discredit, but generally it does not disqualify a witness. We admit that if we were jurors and it appeared that the prosecuting witness was to receive money in case of conviction, and that this was the motive inducing his testimony, we would not as readily yield to the conviction of the defendant's guilt as if the testimony came from a disinterested witness; but it could not be held that a witness's pecuniary interest in the result of the case stopped his

mouth.    Learned counsel for the plaintiff in error attempted to sustain this view by the argument that, as the defendant can only make a statement, he is, "as a witness, as dead as Hector."    We are not concerned with the reasons which may have controlled the legislature in providing that a defendant may make a statement, instead of permitting him to be sworn in his own behalf.    As we have heretofore said, a defendant's statement is an anomaly.    But certainly it can not be said that the defendant's mouth is stopped (although he is not permitted to be sworn), when he is permitted to make any statement he sees proper in regard to the case, and when the jury have the right to believe that statement even in preference to the sworn testimony.    None of the cases cited in the brief conflict in any wise with what we here rule.    Admitting that a defendant can state whatever he pleases that is pertinent to the case, and that the jury can believe it even to the exclusion of sworn testimony, it can not be said that any one who has an interest in the prosecution is, by that interest, debarred from testifying.    See Hawes v. Glover, 126 Ga. 315 (55 S. E. 62) ; Hendrick v. Daniel, 119 Ga. 360 (46 S. E. 438).    The policy of the act of 1866, embodied in the code section, seems to permit all persons to testify, regardless of interest, provided the other party is not dead or insane.    Lord Denham's act was substantially the same as the evidence act of 1866, but even before the passage of that act, under the common law, the fact that a prosecutor had an interest in property which might be recovered did not disqualify him from testifying.    Of course, these are not exactly similar cases to that of a person who has no original interest in the subject-matter of the prosecution, but is merely seeking to gain a reward from a prosecution and conviction for a crime, and the exact point raised in this case is a novel one.    Still, if §5269 is to be literally construed, even the interest which arises from the expectation of a reward in a criminal case will not disqualify a witness or render his testimony incompetent.    Our loathing for testimony bought with money may compel us to reject it if we are satisfied it is false, or are not satisfied that it is true, but we must hear and consider it.    The fact that the testimony is induced by a price may authorize disbelief, but does not permit its annihilation as testimony.

4.    Another ground of the motion for new trial complained that the judge permitted the jury to take with them to the jury

room the jug which the witness had testified contained whisky, the tomato can, and the broken glass. It is insisted that this was error, because it afforded the jury, if the jug contained intoxicants, the opportunity of first imbibing, and then, under the influence of the whisky, proceeding to find a verdict. The oath of the bailiff in charge of the jury is invoked as an argument in favor of this contention. In reply to this it need only be said, that the oath of the bailiff does not prevent a jury from being given any article, provided the judge so directs. After the judge has directed that the jury be permitted to have a thing, it becomes a question as to whether or not the possession and use of the article was injurious to the losing party. It is not to be presumed that a jury, seeking to conduct themselves properly, and actuated only by a desire to ascertain the truth, will become intoxicated simply because they might have the opportunity, in investigating the evidence in the case. Nor does it appear in the present case that such was the result. The next reason advanced why the jug with its contents should not have been submitted to the jury is that the defendant has the right to be confronted by the witness testifying against him, and any act of the court tending to abridge that right is reversible error. A complaint is made that the jurors were not sworn as witnesses, and that, in examining the jug and its contents, they would take into consideration their private knowledge. As we stated before, no showing is made that any of the jurors tasted the contents of the jug. But conceding that some of the jurors had tasted the contents, if the jug did not contain whisky it would have afforded the defendant his surest defense. This would have been a demonstration of his innocence.

We thoroughly agree with counsel for plaintiff in error in the proposition that a juror is not permitted to take into consideration his private knowledge of facts in reaching a verdict, and that no testimony can be introduced as against a defendant except in a public trial. But even if one or more of the jurors, in the consideration of the case after they retired, tasted the liquid, and thus ascertained that it was or was not whisky, we do not see that the case would have been different from his looking at the wine glass and determining from the peculiarity of its fracture (which had been testified to) that it was a glass. Each is alike a case of identification by one of the five senses. In the identification of the

glass it would be by that of sight; the identification of the contents of the jug would be by that of taste, or it might be that of smell. There was testimony that that was the identical glass used in the sales; there was testimony tending to the conclusion that that was the identical jug with the same contents as when taken from the defendant's house. Nothing is better settled than that any article identified as coming from one's possession or found in his dwelling may be put in evidence upon his trial for crime, to illustrate the nature of his possession or the use to which it had been subjected. There is scarcely a trial for murder, in which the life of the prisoner is at stake, that the weapons or clothing of the defendant are not introduced. In some cases such evidence may be more valuable to the defendant than to the prosecution. The evidence identifying the articles to which objection is made was sufficient at least to authorize the court to submit the jug and its contents to the jury, for them to determine by their own senses whether the oral testimony of the witness upon this point was true or false. The view which a certain juror might take of such physical testimony in discussing it with his fellows can not affect its admissibility, and is not to be considered as testimony delivered beyond the hearing of the defendant on trial. If that were true, the defendant would be entitled to rebut the impression which the juror received from his sense of sight, or to prevent him from communicating it to his fellow jurors, unless he was first sworn as a witness. And so, in a case of homicide, the juror who might be of the opinion that a stain upon the defendant's knife, or his clothing taken with them to the jury room, was blood, judging by his sight, would not only be prohibited from expressing that opinion, but his fellow jurors, not being permitted to have either the knife or the clothing with them in the jury room, would have no opportunity of viewing these mute witnesses with their fellow juror, and of satisfying the entire panel, by investigation, whether the stains were in fact blood or not blood. As measured by the rule laid down in *Drake* v. *State*, 75 *Ga.* 413, there was no error in allowing the jury to take with them to the jury room the jug and its contents. It was not necessary in this case for the jury to have tasted or smelled the contents of the jug. There was testimony that it contained whisky. The defendant did not deny this, although he did deny ever having sold any of the whisky. There is no evidence that the jury did in fact use their

personal senses to test the comparative strength or weight of the testimony.    But as we have said before, there are some cases where the evidence is in part derived from physical objects, in which cases the jury must wholly by sense of sight determine what is proved. This rule has been recognized from time immemorial.    And if the juror may ascertain and determine by sight (as in comparison of handwriting, in cases of forgery) facts which are vital to the guilt or innocence of the accused, why may he not, even though not sworn as a witness, ascertain by smell or taste whether a liquor coming from the possession of a defendant is or is not an intoxicating beverage?    If there be objections to this practice, it could at least be said to be a step toward a return to our first jury trial, when the witnesses themselves were the jurors.    If in any case there is a perversion of the privilege thus accorded the jury, of inspecting the physical evidence in the case, which is injurious to the defendant on trial, and injury is shown, a new trial should be granted.    In this case neither error nor injury appears.

*Judgment affirmed.*